## FIELDS v. HURST.

1. Objection was made by plaintiff to the hearing by the Circuit judge of defendant's exceptions to the referee's report; the objection was overruled and plaintiff excepted. After decree rendered, plaintiff filed exceptions thereto, but did not renew his exception to the hearing of defendant's exceptions to the referee's report. *Held,* that this question, not having been made a ground of appeal, was not properly before this court for review.

2. No exceptions having been taken to an intermediate decree at the time, or after final judgment rendered, objections cannot be raised in this court to such decree.

3. Exceptions not considered, because too general.

4. The provisions of the code as to referee's reports apply especially to cases at law. References in equity causes are governed by the rules which prevailed under the old chancery practice. The force and effect of a referee's report, in all cases, stated.

5. Findings of fact by a referee were reversed by the Circuit judge; the Circuit decree, upon these points, was sustained by this court. MR. CHIEF JUSTICE SIMPSON dissenting as to one of these findings of fact.

6. The Circuit decree, after allowing all proper items of debit and credit in an account, made a small balance in favor of plaintiff, but nevertheless dismissed the complaint upon the ground that they were substantially equal. *Held,* that the plaintiff was entitled to judgment for the balance ascertained in his favor in such statement.

---

Before HUDSON, J., Darlington, November, 1882.

The decree of the Circuit judge makes a full statement of the case. It was heard by him on the following exceptions by defendant Hurst to the referee's report: "1. Because the referee erred in his findings both of law and fact. 2. Because the conclusions of the referee are unsupported by the testimony,

and contrary to the law applicable to the same." Before the hearing, plaintiff's counsel objected that the exceptions were insufficient, and suggested nothing to be heard by his Honor. The case was ordered to proceed, and plaintiff excepted.

The decree was as follows :

This cause was heard by me, November 28th, 1882, upon exceptions to the report of the referee. As this is a decree upon the main issues in the cause, except as to preliminary points heretofore adjudicated, a brief history of the litigation betwixt the parties to the original transaction will not be inappropriate. In fact, such a summary is necessary to a proper understanding of the case. The litigation began twenty-two years ago, and the transactions giving rise thereto originated twenty-four or twenty-five years ago.

About the year 1857, one John Gatlin sold and conveyed the land described in the pleadings to one Jacob Kelly, and, to secure the purchase-money, took Kelly's notes—three in number, we presume, each for about $800 ; one, at least, was for that sum, and the land was sold for about $2,500. One of these notes for $800, some time afterwards passed into the hands of the present plaintiff, Matchet Fields. Hearing of this fact, and hearing also that there were against Gatlin in the sheriff's office various and sundry unsatisfied executions incumbering this land, Jacob Kelly became alarmed and dissatisfied, and expressed a desire to rescind the sale and regain possession of his notes.

An opportunity soon occurred to enable him to accomplish this purpose. In 1858, it was learned that Samuel F. Hurst desired to buy the land, and was willing to pay therefor about the sum contracted to be paid by Jacob Kelly, to wit, $2,500. To enable him to get a good title, an arrangement was entered into between Gatlin, Kelly, Hurst and Fields to the following effect : Kelly was to reconvey the land to Gatlin, and receive back his notes. Hurst was to give for the land a negro woman, valued at $1,000, and two promissory notes, the one for $825, payable January 1st, 1860, and the other for $850, payable January 1st, 1861, each bearing interest from January 1st, 1859. These notes, however, were to be made payable to Matchet Fields instead of to John

Gatlin, and the bill of sale of the negro woman was likewise to be made to Fields.

It was further agreed that Fields should thereupon give to Hurst his bond for titles to the land in consideration of the negro woman and the notes; and to enable Fields to put himself in condition to make good title to Hurst, he was to have the land sold at sheriff's sale under the outstanding executions in the office against Gatlin, and bid the same in. Betwixt Gatlin and Fields it was agreed that Fields, having thus secured title, should hold the same merely to re-imburse himself for any outlay of money on his part in buying up and extinguishing the liens in the sheriff's office. That so soon as he should thus re-imburse himself from the notes of Hurst, the balance, if any, should go to Gatlin. As for the negro woman, it was agreed that she, the title being in Fields, should nevertheless be delivered over to the use and benefit of Mrs. Gatlin, wife of John Gatlin, then an invalid.

The parties accordingly met, when the other notes of Kelly, besides the one then held by Fields, were delivered into the hands of Fields, who then surrendered all of them to Kelly, whereupon Kelly assigned his deed to the land to Gatlin, and delivered the same, thus indorsed, to him, thinking thus to re-invest him with title. The bill of sale of the negro woman and the notes were then executed by Hurst and delivered to Fields, who executed and delivered to Hurst his bond for titles. It is also in testimony on the last reference, that the terms of the agreement between Gatlin and Fields were also reduced to writing, to the effect aforesaid, and duly delivered, but that the same has been lost or destroyed in some way.

It may be as well to remark here, that throughout the long protracted period of this contention, and amidst all the conflict of testimony, the aforesaid terms of the agreement and statement of the transaction between the parties are sustained by the testimony generally, except the contention as to the first note of $800 of Jacob Kelly, which went into the hands of Matchet Fields, he contending that he had bought and paid for this note in gold, and that for this outlay he was also to be re-imbursed out of the notes of Hurst, whilst the defendants, and witnesses who are able to speak of the transaction, deny this, and state in substance that

he held this note only as security for money laid out for Gatlin on executions, or to be laid out, and that the notes of Hurst were taken by substitution for and indemnity for the same outlay. At least such is the inference that defendant's counsel ask this court to draw from the testimony. At all events, this $800 note of Kelly is the pivotal point of the contention.

During this year, 1858, Fields did pay several hundred dollars on executions against Gatlin, and, having this land sold at sheriff's sale, did purchase the same at and for the nominal price of $20, representing that he was buying the same for Gatlin's benefit, and was to pay off the executions in the office against him, thus enabling himself to buy it at this low price.

In due season, Hurst becoming ready to pay his first note, went, in company with Gatlin, James, the son of Jacob Kelly, a Mr. Lee, and perhaps another, to the residence of Matchet Fields, to pay this note, and to have a settlement of the indebtedness of Gatlin to Fields on account of money laid out and expended for Gatlin's benefit. Fields evaded a settlement, saying that his papers were at the court house, and that in their absence he could not come to a settlement. Thereupon, Gatlin, Hurst and the others repaired to the court house to ascertain what amount Fields had paid on executions against Gatlin. Finding no evidence of any payments, or at least of but small outlays, Gatlin forbade Hurst to pay anything to Fields, and insisted that, as no outlay had been made by Fields, Hurst should make payment to him and take title from him. Accordingly, Hurst did so, paying then the first note, and subsequently the second one, and took title from Gatlin and also a quit-claim deed from Kelly.

Afterwards, learning of these transactions, Fields threatened to seize the negro woman, and began suit on the notes of Hurst. To prevent Fields from collecting this money of Hurst, and to compel him to deliver up further claim to the land, Gatlin, in February, 1860, filed his bill in the Court of Equity for Darlington, and sued out an injunction. To this bill, strange to say, Fields made no answer until August 31st, 1868. During this interval, at various and sundry times, he obtained leave for further time in which to answer, the injunction in the meantime remaining of force, with not an effort to dissolve the same.

The version of the contract given by Gatlin in his bill was strongly supported by affidavit of Jacob Kelly, Hurst, James Kelly, a Mr. Lee, a magistrate who drew the papers, and others. These facts, of course, are not evidence in this cause, and are only stated in narration of the course of litigation. In this answer to the bill, Fields gives his version of the contract and dealing of the parties, and avers that he bought and owned the $800 note of Jacob Kelly, and had settled in full with Gatlin and passed receipts, and that he was the sole and rightful owner of the negro woman and of the notes of Hurst, which had been wrongfully paid to Gatlin. Also, that he had perfect title to the land, having the sheriff's deed and also a quit-claim deed from Jacob Kelly. [Perhaps it is a mistake in me to say that Hurst had a quit-claim deed from Kelly.]

The cause stood thus on the docket of the Court of Equity, without a hearing, until 1871, when it was stricken off. No further proceedings were had in relation to this contention until September, 1875, when, John Gatlin having died, Matchet Fields began this action against Samuel F. Hurst and the other defendants, some of them having, perhaps, been added by amendment. It should be here remarked that the defendant Harris purchased his part of the land from Hurst in 1862, and that Grantham bought his at some sheriff's sale—exactly when I don't discover from the answer or testimony. On January 8th, 1880, Grantham also took title from Fields, for $100, to his part, and on the same day Harris also took title from Fields for $500; and they, having also titles from all other claimants, are no longer concerned in the litigation.

Running over narration, the cause came on to be heard before his Honor, Judge C. P. Townsend, at the February Term, 1877, of this court, when judgment turned upon a technical issue—statute of limitations—and, being appealed from, was reversed by the Supreme Court and a new trial ordered. See 9 *S. C.* 277. The cause was then referred to J. J. Ward, Esq., as special referee, to hear and determine the issues of fact and of law. He heard the cause and non-suited the plaintiff. The plaintiff appealed to the Circuit Court, and Judge Pressley held that the appeal should have been directly to the Supreme Court, but he recommitted it

to the referee with directions, if he saw proper, to give the plaintiff a rehearing.

The referee, after argument heard, granted a new trial and gave judgment for the plaintiff. To this the defendants excepted, and the case on exceptions was heard by Judge Kershaw, who, on August 1st, 1882, rendered his decree, in which, after passing upon various technical matters, he recommitted the case to the referee to ascertain the state of the accounts between Fields and Gatlin, holding, in effect, that Fields held the notes of Hurst in trust for Gatlin, as an indemnity to the said Fields for all moneys due him under the contract of 1858, and in trust to pay the balance to Gatlin. He orders the unsold part of the land to be sold to pay the balance so found to be due to Fields, if any, unless by a given day Hurst should pay the same.

This reference was accordingly held, and, after much testimony, the referee stated the accounts and reported a balance due by Gatlin to Fields, on January 1st, 1860, of $1,218.04. With interest to November 16th, 1882, this amounts to $3,324.50. As a credit, he has allowed Hurst $225 for use of the land by Fields' tenants for the three years last past, which being deducted, leaves a net balance, November 16th, 1882, of $3,099.50. The $600 which Fields got from Harris and Grantham he refused to allow as credit to Hurst because these men had also paid Hurst or Gatlin for their purchases—the payment to sheriff being considered payment to Gatlin.

The contest before me turns upon the $800 note of Kelly's, charged against Hurst, *alias* Gatlin, and the refusal of the $600 credit. The referee who heard this case is an intelligent lawyer, and his findings of fact are entitled to great weight. In fact, those findings must stand unless they are discovered to be unsupported by the testimony, or against its manifest weight. I have, therefore, put myself to the trouble of reviewing the testimony with much care after listening to the earnest comments thereon of the learned and able counsel engaged in the cause.

The foregoing full recital of the history of the litigation through all its stages from beginning to end, has been given in order to bring before us in prominent shape the points at issue. To recite the testimony here would give to this judgment undue

length and tediousness. I shall be content here merely to give the impressions made upon my mind by a review of all the proceedings and pleadings and documents placed in evidence, and especially by the testimony of the living witnesses who, without objection, have been admitted to give testimony to the transactions with both the living and dead.

I conclude that the following facts are established either by undisputed testimony, or by the great weight of the evidence:

*First.* That John Gatlin, being in embarrassed circumstances, and wishing to relieve himself of his pecuniary troubles that were pressing him, sold his land with that view to Jacob Kelly, who bought on a credit, not knowing of the liens of outstanding executions. To remove these liens and thus prevent impending sale, Gatlin transferred one of the Kelly notes of $800 to Matchet Fields, not for its value in money, but as a security to Fields for money which he agreed to apply to liens in the sheriff's office.

*Second.* Fields began to apply money to these liens, in the small and by part payments, so as to keep creditors quiet when impatience was manifest. Kelly, learning of the existence of these liens, and that Fields had one of his notes, very naturally became dissatisfied, and desired a rescission of the sale. It was then learned that Hurst would take Kelly's bargain off his hands.

*Third.* It was then arranged between Gatlin, Fields, Hurst and Kelly, that the trade with Kelly should be rescinded, and that Hurst should become the purchaser, at $2,575, of which $1,000 should be paid by delivering a negro woman, and the balance should be secured by the two notes as aforesaid, one for $825 and the other for $850. As Matchet Fields was the man with money, it was agreed that he should get title to the land; that to him should be given the title to the woman and the two notes of Hurst, and to the said purchaser of the land Fields' bond for titles should be given; that Fields should extinguish the executions in the sheriff's office, a part of which he had already made payments on upon the security of one of the Kelly notes. To secure and indemnify Fields for all moneys thus expended, he was to hold the title to the land and to the negro, and notes given by Hurst, with the understanding and upon the trust and

confidence, that when Hurst should pay the money, Fields should retain sufficient to pay himself for his expenditures, and account to Gatlin for the balance.   Should Hurst fail to pay, then Fields should look to the negro woman and the land for pay; and if sold, he should, out of the proceeds, first pay himself, and then account to Gatlin for the balance.

Upon these terms the contract was consummated, the notes of Kelly were surrendered, and the obligations of Hurst were substituted, and Fields proceeded accordingly to pay further sums on the executions.   The note of Kelly he held, not as a purchase, but as an indemnity.   Had he paid the cash to Gatlin for this note, as he claims to have done, it is certain that the proceeds would have been promptly and gladly applied by Gatlin to the executions in the sheriff's office, and would have extinguished a much larger amount of those liens than Fields did extinguish from beginning to end, both while he held the Kelly note and after he got the larger security from Hurst.   I only mention this as one circumstance amid the many in the case—to say nothing of the testimony of witnesses—going to show that the Kelly note was not bought by Fields, but was held by him only as an indemnity.

I am constrained, therefore, by what I conceive to be the great weight of the testimony and evidence in the case, to hold that the referee erred in charging this $800 note against Hurst and Gatlin in this accounting, and it must be stricken out. This item being erased from the account, there is left on the first day of January, 1860, due by Gatlin to Fields, for money expended by him for said Gatlin, and the interest thereon, the sum of $362.12; and this amount corresponds with the sum which living witnesses say that Fields did expend for Gatlin, and which Gatlin, in his bill in equity, alleged as the amount. He there stated that it was not over $400.   Of course the allegation of that bill, and the denials in the answer, are not testimony, nor were they received as such; but I merely mention the fact that the testimony of living witnesses and the account thus corrected, corroborate what is averred in that bill, and which Fields took eight years' time to deny.

T

Now, on January 8th, 1880, Fields received of Grantham, for part of this land, $100; and from Harris, for another part, $500. The referee does not allow Hurst credit for this, chiefly because these men had paid either Hurst or Gatlin for their purchases, and because he did not think that the order of Judge Kershaw was broad enough to admit of such an item of credit. But it is manifest that whatever Fields realized out of the securities he held, viz., the land and the money obligations of Hurst, was that much payment of the outlay for Gatlin. Hurst is just as much entitled to have the proceeds of these sales by Fields to these men credited on his notes, or passed to the credit of the *cestui que trust*, Gatlin, as if the same had been realized from a sale of so much of this land under a foreclosure sale at the suit of Fields. This money must be entered as a credit in the account, as of the date January 8th, 1880.

| | |
|---|---:|
| Now, the sum of | $362 12 |
| Int. from January 1, 1860, to January 8, 1880, is | 508 00 |
| Leaves due, January 8, 1880, | $870 12 |
| Deduct | 600 00 |
| Balance due, January 8, 1880, | $270 12 |

Now, the referee has charged Fields with rent for 1880, '81 and '82, $75 per annum, which wants but little of extinguishing this balance.

Accurately estimated, the account will stand thus :

| | |
|---|---:|
| Balance, January 8, 1880, | $270 12 |
| Int. to January 1, 1881, | 18 50 |
| | $288 62 |
| Then paid, | 75 00 |
| Balance, January 1, 1881, | $213 62 |

April Term, 1883.

| | | |
|---|---|---|
| Balance, January 1, 1881, (bro't forward,) . . | $213 | 62 |
| Int. to January 1, 1882, . . . . . | 14 | 95 |
| | $228 | 57 |
| Then paid, . . . . . . . | 75 | 00 |
| | $153 | 57 |
| Int. to December 1, 1882, . . . . . | 10 | 74 |
| | $142 | 83 |
| Then paid, . . . . . . . | 75 | 00 |
| Balance due to date of decree, . . . . | $67 | 83 |

But when we consider that Fields, during the life-time of Gatlin, refused to come to a settlement, and refused to take the money from Hurst, when he and Gatlin went to him and offered to pay every cent he had laid out and expended; that he refrained from instituting this suit until Gatlin was dead; and lastly, that he took advantage of Hurst's removal from the county, and, ousting his tenants, wrongfully took possession of this land of Hurst, pending this action, we do not deem that he deserves the most liberal and tender consideration at the hands of the court. The referee has failed to consider these circumstances in his estimate of what Mr. Fields should pay for the use of a place wrongfully taken possession of pending litigation. Our estimate is, that the six hundred dollars and three years' use and occupation of the land, fully repays him for the $362.12 which he expended for Gatlin twenty-four years ago, and which, twenty-three years ago, he refused to receive from Hurst when he offered to pay it.

It is, therefore, the judgment of the court that the plaintiff, Matchet Fields, is entitled to demand and receive nothing from Samuel F. Hurst on the notes in suit. It is further adjudged and decreed, that the said Matchet Fields do deliver up to the said Hurst, or his attorneys, the said notes to be canceled; and that he do execute and deliver within thirty days from this date to the said Samuel F. Hurst a warranty title in fee-simple to all the said tract of land, except the parts conveyed to the defend-

ants Harris and Grantham. It is further ordered, that each party, the said Fields and the said Hurst, pay the one-half the costs of these proceedings, and that possession of said land be delivered up to said Hurst by the first day of January next.

From this decree, plaintiff appealed to this court upon the following exceptions :

1. "Because his statements of the case are not supported by the facts and the evidence.

2. "Because the evidence does not support his Honor's finding as to the agreement between Matchet Fields and John Gatlin, and the finding of Judge Kershaw as to that agreement was the judgment of the court.

3. "Because it was error to overrule the finding by the referee that the Jacob Kelly note belonged to Matchet Fields, there being not only no overbearing testimony, but no testimony at all, to justify the finding of his Honor, while three living witnesses support the findings of the referee.

4. "Because there is not a tittle of testimony to support the finding of his Honor that Fields held this Kelly note as security for money laid out and to be laid out for Gatlin on executions in the sheriff's office, while the proof is abundant that Fields was the absolute owner of the note.

5. "Because it was error to use the *ex parte* statements accompanying the bill for injunction as evidence or corroboration of a theory on the facts—the bill only being introduced in evidence to show dates and the fact of injunction.

6. "Because it was error to allow Gatlin, or Hurst, the $600 which Fields got for his interest in the land sold to Harris and Grantham, Gatlin and Hurst having already received the full benefit of the sale of their entire interest therein.

7. "Because upon his Honor's own estimate there is a balance due Fields sufficient to carry costs, and it was error to adjudge nothing to Fields and half the costs against him.

8. "Because there is no evidence that Fields commenced this action after the death of John Gatlin, or that he, Fields, ever refused settlement with Gatlin, or was in any way derelict. And there is no evidence that Fields wrongfully possessed himself of

the land in controversy, or ever got any benefit from it, but improved it.

9. "Because, if the contents of the bill of injunction was to be used at all, as it sought discovery, Fields' answer, being responsive to the bill, was conclusive until disproved by two witnesses."

*Mr. B. W. Edwards*, for appellant.

*Messrs. Boyd & Nettles*, contra.

February 19th, 1884.   The opinion of the court was delivered by

Mr. Chief Justice Simpson. [Omitting his statement of the case, which is fully stated in the Circuit decree.]   In addition to the foregoing exceptions founded upon the decree of Judge Hudson, at the hearing of this appeal appellant's counsel undertook to review the decree of Judge Kershaw, claiming it to be an interlocutory or intermediate decree, and subject to review upon appeal from the final decree, citing *Hyatt* v. *McBurney*, 17 *S. C.* 143.   And the appellant's counsel, in his argument, also raises and discusses the question, "Whether his Honor did not err in hearing the case on the exceptions taken to the referee's report."   It is true this point was made below and, when overruled, was excepted to, but in the notice and grounds of appeal, this exception does not appear.   It is a well-established rule that to authorize this court to consider any question on appeal, it must be made in some form, one of the grounds of appeal, and must be brought before us in some definite and distinct shape.   It will not do simply to except below, but the question must be presented in the grounds, or exceptions brought up to this court, otherwise this court cannot know but that it has been abandoned, nor can the opposite party be expected to meet it.   This question then not appearing in the grounds of appeal, we are not at liberty, under the rule referred to, to consider it, whatever may be the merit therein.

The same may be said as to the attempt to bring under our review the judgment of Judge Kershaw.   No doubt this decree

was an intermediate decree. It was certainly not a final decree, and might have been made the subject of review here upon this appeal from the decree of Judge Hudson, which was a final decree, if it had been excepted to·specifically or by specifying the grounds of error, if any, in the exceptions by which the case has been brought here; but this the appellant failed to do. There is no error alleged in the decree of Judge Kershaw except in the argument, nor have any exceptions thereto or notice of intention to appeal therefrom, ever been filed. It was too late at the argument.· *Cleveland* v. *Bryant,* 16 *S. C.* 635; *Pringle* v. *Sizer,* 7 *S. C.* 134.

This brings us to the exceptions proper. The first, fifth, eighth and ninth are not very material. They do not affect the real questions involved, nor do they raise any question themselves necessary to be determined. The first is entirely too general, and is obnoxious to the same objection which the appellant made to the exceptions to the referee's report, and which he failed to pursue. The fifth and ninth refer to the use that was made of the bill in equity, &c. The judge in his settlement explains this satisfactorily. It seems to have been introduced in evidence by the appellant's counsel for a certain purpose and the judge says its use was confined to that purpose. The eighth seems to us wholly unimportant.

The appeal then must turn on the second, third, fourth and seventh exceptions. The second exception suggests a conflict between Judge Kershaw and Judge Hudson, as to the agreement between Fields and Gatlin. We do not see this conflict. It was held by both of the judges in effect, that Fields was a trustee holding the notes of Hurst as an indemnity until he was re-imbursed; Judge Kershaw said, for all his payments and expenditures on account of Gatlin; Judge Hudson said that Fields was to be re-imbursed for any outlay of money on his part in paying up and extinguishing the liens in the sheriff's office; but both seemed to understand that the $800 note, over which the most serious contest took place, was to be considered, and Judge Hudson did not exclude this on the ground that it was not one of the matters which, even though valid, could not be allowed under the agreement, because not one of the debts of Gatlin,

which Fields was to pay off; but he excluded it on the ground that the testimony failed to show that Fields had ever advanced money to Gatlin for said note. According to his idea, Fields held this note as an indemnity for moneys to be advanced for Gatlin on his debts, and that the Hurst notes were substituted in its stead when Kelly rescinded his trade and Hurst took his place as purchaser. So there is really no conflict between the two decrees on that subject.

The third and fourth exceptions raise substantially the same question, and that is whether the finding of the referee as to the $800 note should have been disregarded and overruled by the judge. When Judge Kershaw heard the case, after determining the principles upon which the contest should be decided, he recommitted the matter to the referee, Mr. Ward, to ascertain and report the balance due, if any, by the defendant Hurst upon his notes given for the purchase of the said land, after allowing the credits to which he is entitled under the agreement as adjudged by him. It will be observed from the recital of the substance of Judge Kershaw's order, that nothing but the finding of a certain matter of fact was referred to Mr. Ward, to wit, the balance due on Hurst's notes, after allowing the credits to be established. There was nothing for Mr. Ward to do but to ascertain the credits, and to deduct them from the notes. This involves nothing more than questions of fact.

Now, it is provided in the code, that when nothing more than a question of fact is referred to a referee, in such case his finding and report becomes a special verdict, or, rather, in the language of the code : " The report shall have the effect of a special verdict." *Lynch's Code,* § 296. Where the whole issue is referred, the report then stands as a decision of the court, and judgment may be entered thereon in the same manner as if the action had been tried by the court (*Ibid.*), subject to be reviewed on appeal under the provisions of section 292 *Lynch's Code.* To what court this appeal must be carried, in the first instance, is not now involved. But the report of the referee upon an issue of fact referred to him becomes a special verdict, and being a special verdict it is subject to be set aside, for any of the causes for which verdicts may be set aside, and the action of the judge in

reference to such a case, so far as this court is concerned, must be considered as in any other case where verdicts are vacated and a new trial ordered.

These provisions of the code, however, are understood to apply especially to referees appointed under the code in actions at law, and not to referees appointed in equity causes. These latter are governed by a different rule : the rule which prevailed under the old chancery practice, where cases were referred to the master, an officer of the court, or to a referee, or sometimes to a jury, to assist the court, and for its information. The case before us is an equity case. It is substantially for specific performance, a case of equity cognizance, and must be governed by the rules established in this court in the various decisions upon subjects of this character, all of which are found cited in the "note of the reporter" in 12 *S. C.,* *p.* 609. And it belongs to that class where there is a difference between the judge and the referee upon the facts. In such case, this court will examine the decree, and either adopt or reject it, as the facts may warrant, to the same extent as a Circuit judge passes upon the report of the referee. The question, then, is an open question uninfluenced by the previous findings, and free from the operation of the rule adopted in other cases, that said finding will not be disturbed unless there is an absence of all testimony to support it, or the evident and overwhelming weight thereof is the other way.

Coming to the examination of the question of fact as to the $800 note as an open question, dependent entirely upon the force and effect of the testimony, we are constrained to support the finding of the referee. The question as to this note was, Did Fields advance the money to Gatlin for that note, or was it placed in his hands as an indemnity for such sums as Fields might thereafter pay for Gatlin ? The testimony of the plaintiff Fields is positive upon this subject. He states, unqualifiedly, that he paid Gatlin the full amount of this note. His son, P. G. Fields, swears that he wrote the indorsement on the note by which it was transferred to Fields ; that this indorsement was witnessed by himself and one Jesse Walker ; that Gatlin told him that he owed his father the note and a great deal more. Jacob Kelly, the maker of the note, knew the fact that Fields

had become possessed of this note very soon after he had executed it to Gatlin, and on that account, in part, he became dissatisfied with the trade. He did not want Fields to have this note upon him, and he had charged Gatlin not to let Fields have it.

Now this is all the testimony that bears directly on the note. It is true that the character of Fields was assailed, not, however, with entire success. Three out of thirteen witnesses would not believe him on his oath, but six of the same thirteen would; but then there is no doubt that the note was indorsed to and delivered by Gatlin to Fields. He thus became the legal owner, with all the presumptions in his favor. These all seem too strong to be overturned by the theory of the defense worked out of circumstances not entirely pertinent to the question at issue. We think the preponderance of the testimony is with Fields, and that he should have been allowed this note on the computation of his claims against Gatlin.

We sustain the finding of the judge as to the credit of the $600 received by Fields from Harris and Grantham. The intent and purpose of the transaction in reference to the land was to indemnify and secure Fields, and whatever he received therefrom should redound to the credit of Gatlin. Harris and Grantham, after they had purchased from Hurst and Gatlin, found it necessary to pay Fields this $600 to obtain good titles. Fields has no claim to this except as a benefit to Gatlin. He had no interest in the land except through Gatlin, and whatever he received was really for Gatlin, and he should account for it in a settlement with Gatlin, which settlement the court ordered the referee to make. If Harris and Grantham purchased from Hurst and Gatlin on a mistake as to the title, and the consideration has failed, they may possibly have a claim against Hurst and Gatlin to be re-imbursed; but this does not release Fields from the necessity of accounting for the amount received by him.

We do not see upon what testimony the judge decreed that Fields was entitled to nothing, and that he should be dismissed with one-half of the costs of the proceedings. After throwing out the $800 note, and charging Fields with the $600 received from Harris and Grantham, the itemized accounting, as appears

in the decree itself, brought Gatlin in debt $67.83. (This amount should have been $89.31, as clearly appears from a mistake in the calculation of deducting the interest instead of adding it.) This balance is then expunged, upon the general statement that the $600 and the use of the land had sufficiently repaid Fields for the $362.12 found by the referee in his favor; yet the $600, and $75 per annum for three years' use of the land, had already been deducted from the $362.12 and interest, leaving this balance of $89.31 unpaid. The judge thought from the testimony that Fields had wrongfully taken possession of the land, and that the referee had not given sufficient consideration to this fact in estimating the value of the use and occupation of the land. This may be so; but this was not sufficient, as it appears to us, without further examination and testimony, to bring the parties exactly even, or to warrant a judgment that Fields was entitled to nothing.

I think upon the testimony that Fields should be allowed the $800 and interest; that his claims against Gatlin should be credited with the $600 received by him from Harris and Grantham, and that he should have judgment for whatever sum may then be found due, and that he should have his costs; and to this end that the judgment below should be reversed, and the case remanded to the end that a judgment in accordance herewith may be pronounced.

MR. JUSTICE McIVER. While I agree with the chief justice as to the other questions made in this case, I do not think the evidence is sufficient to warrant us in reversing the conclusion reached by the circuit judge as to the Kelly note for $800, and, on the contrary, think his conclusion is supported by the preponderance of the testimony.

There can be no doubt that the notes of Hurst were given to Fields, not as evidences of any debt due by the former to the latter, but simply to indemnify Fields against certain claims which he had against Gatlin. The burden of proof was, therefore, upon Fields to establish such claims. It was incumbent upon him to show that the note in question—the Kelly note— had been bought by him, and had thus become his absolute

property, and was not held by him merely as indemnity.   Upon this point, as, indeed, upon almost every other point involved in this controversy, the evidence was conflicting, and when this is the case, as we have held in *Maner* v. *Wilson,* 16 *S. C.* 470, the conclusion reached by the circuit judge, even though adverse to that reached by the referee, must be regarded as *prima facie* the correct conclusion.

It does not appear distinctly when the plaintiff claims to have bought the Kelly note from Gatlin.   The plaintiff, at one point in his testimony, says that he bought this note about twelve months before the transaction with Hurst, which, from the date of the Hurst notes, must have been on September 8th, 1858. At another place he says : " Bought the note in the latter part of '58 or first of '59, when the papers were fixed between him and Gatlin."   P. G. Fields, the son of the plaintiff, says in his testimony that the note was indorsed by Gatlin to his father on April 18th, 1858, and that "witness and Jesse Walker were witnesses to the indorsement."   This witness, when previously examined, fixed the date of the transaction between his father and Hurst at April 18th, 1858.

All of the witnesses, on both sides, agree in one thing—that when the transaction between Fields and Hurst took place, out of which the present controversy arises, the trade previously made between Gatlin and Kelly was rescinded, and Kelly's notes, given for the purchase-money of the land, were then surrendered to him ; but there is no little conflict as to what occurred between the parties at the time.   According to the testimony of the defendant Hurst, and his witness Lee, nothing was said by Fields when he surrendered the note which he had previously held on Kelly about his having bought the note, or about his having any absolute claim to it, although the plaintiff did, when last examined, claim to have mentioned the fact at that time. Nor does it appear that Fields set up any claim to have been the absolute owner of the note in question when the first note of Hurst fell due, and James Kelly, as the friend of Gatlin, with others, went to Fields for the purpose of having a settlement of what Gatlin might be due Fields.   It seems, too, that Fields paid the largest judgment against Gatlin on October 22d,

1857, whether before or after the time he claims to have bought the Kelly note from Gatlin, his own testimony, and that of his son, leaves it doubtful, though it was certainly some time before the transaction with Hurst, and before the date (April 18th, 1858,) fixed by his son.

It seems to me that the plaintiff's case rests entirely upon his own testimony, and upon that of his son; for according to my understanding of the matter, the testimony of Jacob Kelly affords no support whatever to the claim of the plaintiff. He only proves what is conceded on all sides—that Fields had one of the notes which he had given to Gatlin to secure the payment of the purchase-money of the land. He says: "From time I made bargain, I heard Fields was to get my notes. I charged Gatlin not to let him have them. He went and let Fields have one of my notes. * * * Gatlin went and left one of my notes with Fields." Now, when it is remembered that the character of Fields was, to say the least of it, proved to be not above suspicion; that he was an interested witness, testifying as to transactions with one whose mouth was closed by death; that his testimony was marked by numerous contradictions and inconsistencies, it is difficult to rest with confidence upon his statements, especially when contradicted by other witnesses of unimpeached character, some of whom are entirely disinterested, and when his statements are contradicted by the probabilities of the case.

If, as he alleges, he was the absolute owner of the Kelly note, it is scarcely credible that he would have surrendered it without taking something definite in its place. Why was it that he did not require from Hurst one note for the exact amount of the Kelly note, to say nothing of the fact that, as testified to by two witnesses, he did not even claim at that time to be the absolute owner of the Kelly note? Gatlin's object in selling the land seems to have been to get released from the pressure of judgments then subsisting against him; and why should Fields pay him $800 in cash, a sum, as the event has proved, more than sufficient to satisfy all the judgments against him, and, at the same time, undertake to satisfy such judgments? If it be true that Fields paid Gatlin in cash for the note, what security did Fields then have to indemnify him against any amounts that he

might thereafter pay for Gatlin, to say nothing of the judgment for nearly $200 which he had then paid, or which he, at least, paid before the transaction with Hurst? If Fields paid the judgment for $195.12, in favor of *Moses & Haynesworth* v. *John Gatlin*, before he got the Kelly note, it is scarcely conceivable that he would have paid Gatlin the face of the note in cash, as he says he did, without deducting the amount thus paid. But if he paid such judgment afterwards, then, according to his version, he held no indemnity whatever; and yet, when the transaction was made with Hurst, he seems to have required the most ample indemnity. Such conduct is entirely irreconcilable with all the probabilities of the case.

The inevitable inference from all the facts and circumstances of the case is that the Kelly note for $800 was originally "left" with him (to use Jacob Kelly's expression) as an indemnity against any amounts which he may then have paid or might thereafter pay for Gatlin; and that when it was agreed to rescind the land trade which Gatlin had made with Kelly, this note, together with the other notes of Kelly, were surrendered; and the notes of Hurst, together with the title to the negro woman, were given to Fields as a substitute for such indemnity. This, at least, is the version of the only really disinterested witness to the transaction—one in whom all the parties seem to have had confidence, as he was called upon to draw the papers.

I think it is a mistake to say that there is no doubt that Gatlin indorsed the Kelly note to Fields, who thereby became the legal owner, with all the presumptions in his favor; for, while this fact is testified to by P. G. Fields, the son of the plaintiff, it is contradicted, not only by Hurst but also by Lee, who is an entirely disinterested witness, so far as the issues in this action are concerned, and who, being a surety on the note, would, most likely, have examined it very closely. Then, too, the account which P. G. Fields gives of the manner in which such alleged indorsement was made is, to say the least of it, very extraordinary; and the failure to produce the testimony of Jesse Walker, alleged to have been the other witness to this rather unusual proceeding, who does not appear to have been in any

way interested or connected with any of the parties, to prove this fact so important to the plaintiff's claim, is not without significance.

Without going into a minute discussion of the testimony, but after a full and careful consideration of all the facts and circumstances of the case, I am unable to see any sufficient ground for reversing the judgment of the Circuit Court as to the Kelly note. But, as is shown in the opinion prepared by the chief justice, there is error in such judgment upon another point, I think the judgment of this court should be that the judgment of the Circuit Court be reversed and that the case be remanded to that court with instructions to render judgment in favor of the plaintiff against the defendant, Samuel F. Hurst, for the sum of $89.31, together with interest thereon from the date of Judge Hudson's decree, and the costs of this case; and that unless the same be paid within a time to be limited in such judgment, then the lands described in the complaint, except such as have heretofore been conveyed to the defendants Grantham and Harris, be sold at such time and on such terms as the Circuit Court may prescribe, and the proceeds be applied first to the payment of the costs of this case, together with the expenses of such sale, next to the amount herein ascertained to be due to the plaintiff, and the balance, if any, be paid over to the defendant, Samuel F. Hurst.

Mr. Justice McGowan.   I concur with the chief justice, except as to the Kelly note; but as to that, I agree with Judge McIver.   I think the claim that Fields paid cash for the note is inconsistent with the whole course of business between the parties.

Judgment reversed.